Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/18/2019 09:08 AM CST

State of Nebraska, appellee, v.
Rolander L. Brown, appellant.
___ N.W.2d ___

Filed January 18, 2019.    No. S-17-1039.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

3. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within statutory limits absent an abuse of discretion by the trial court.

4. **Telecommunications: Records: Warrants: Probable Cause.** The government must generally obtain a warrant supported by probable cause before acquiring cell site location information from a wireless carrier.

5. **Constitutional Law: Search and Seizure: Evidence.** The exclusion of evidence obtained in violation of the Fourth Amendment is not a personal constitutional right. Rather, the exclusionary rule operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.

6. **Constitutional Law: Search and Seizure: Police Officers and Sheriffs: Evidence.** The exclusionary rule does not apply to evidence obtained by police in objectively reasonable reliance on a statute later found to be unconstitutional.

7. **Trial: Evidence.** Evidence that is irrelevant is inadmissible.

8. **Evidence.** Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

9. \_\_\_\_. Relevancy requires only that the probative value be something more than nothing.

10. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

11. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

12. \_\_\_\_: \_\_\_\_. Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

13. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

14. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

15. \_\_\_\_. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

16. \_\_\_\_. Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively.

Appeal from the District Court for Douglas County: JAMES T. GLEASON, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Following a jury trial, Rolander L. Brown was convicted of second degree murder and other offenses arising out of the death of Carlos Alonzo. Brown appeals his convictions and sentences, primarily arguing that in light of the U.S. Supreme Court's recent opinion in *Carpenter v. U.S.*, ___ U.S. ___, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), the district court erred by denying his motion to suppress cell site location information. We find that the district court did not err in denying Brown's motion to suppress and that Brown's other assignments of error also lack merit. We affirm.

## BACKGROUND

In the early morning hours of May 28, 2016, Alonzo was found dead in the front yard of a home near 20th and Lake Streets in Omaha, Nebraska. Alonzo died from a single gunshot wound to his head. The State filed several charges against Brown arising out of Alonzo's death: first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person.

*Brown's Motion to Suppress.*

As part of its investigation into Alonzo's death, the State submitted an application to the district court under the federal Stored Communications Act seeking an order compelling the disclosure of certain records pertaining to a cell phone that evidence showed was used by Brown. The court granted the order, and the State obtained the records from the relevant wireless carrier. The records included cell site location information (CSLI), the details of which are discussed below.

Brown moved to suppress the CSLI on the ground that the State obtained it in violation of his Fourth Amendment rights. The district court denied the motion to suppress.

*Trial Evidence.*

At trial, the State introduced evidence indicating that Alonzo was shot outside the residence of Doloma Curtis. Both Alonzo and Brown were dating Curtis at the time. Cell phone records introduced into evidence showed that Brown was communicating with Curtis via text message late in the evening of May 27, 2016, into the early morning hours of May 28. Cell phone records also showed that Curtis did not answer several calls from Brown after 1 a.m. The last such call was made at 2:23 a.m. CSLI from Brown's cell phone records indicated that Brown was in the area of 20th and Lake Streets when he made that call.

At approximately 2:24 a.m., Omaha's "ShotSpotter" location system detected a single gunshot in the vicinity of Curtis' home. Officers were dispatched to Curtis' home. When they arrived, they found Alonzo lying on his back on the sidewalk with a single gunshot wound to the head. During a subsequent search of the area, officers found a single Smith & Wesson .40-caliber shell casing in the grass not far from Alonzo's body.

Surveillance video from a nearby convenience store showed a sedan, which appeared to be missing the hubcap on its front passenger-side tire, back into a parking space near the building at 2:21 a.m. A male exited the car and headed toward Curtis' residence. The male ran back from the direction of Curtis' residence a few minutes later and drove out of the parking lot. Evidence at trial indicated that Brown had access to and drove a sedan that did not have a hubcap on its front passenger-side tire.

The State also relied heavily on the testimony of Parris Stamps. Stamps was a friend of Brown's. At the time of Alonzo's death, Stamps lived near 40th and Boyd Streets with another friend of Brown's, James Nelson. Stamps testified that in the early morning hours of May 28, 2016, Brown arrived at the house where Stamps and Nelson lived. According to Stamps, Brown told him and Nelson that he had just come

from Curtis' house, that he had been in an altercation with Alonzo, and that he "had to put [Alonzo] down." Stamps testified that Brown then pulled out a black Smith & Wesson .40-caliber handgun and removed the clip, which was missing one bullet. Stamps testified that after Brown shared this information, the men were concerned that Brown was "hot." Based on this concern, they traveled to Brown's apartment near 67th and Grover Streets to retrieve two firearms that belonged to Nelson.

Stamps was also allowed to testify, over Brown's objection, that he and his girlfriend were shot in January 2017 and that as a result of the shooting, he was hospitalized and his girlfriend died. Prior to this testimony, the district court instructed the jury that there was no evidence that Brown was responsible for this shooting and that the jury was to consider this evidence only for the effect that it had on Stamps.

Brown's cell phone records corroborated some elements of Stamps' testimony. The cell phone records showed that Brown called Nelson at 2:25 and 2:26 a.m. They also showed that Brown was in the area of Nelson's residence at approximately 2:34 a.m. Brown's cell phone records also showed that Brown returned to his apartment near 67th and Grover Streets around 3:15 a.m.

*Convictions and Sentences.*

The jury found Brown guilty of second degree murder, possession of a firearm by a prohibited person, and use of a firearm to commit a felony. The district court sentenced Brown to 90 to 120 years' imprisonment for second degree murder, 3 to 50 years' imprisonment for possession of a firearm by a prohibited person, and 10 to 20 years' imprisonment for use of a firearm to commit a felony. The district court ordered the sentence for possession of a firearm by a prohibited person to run concurrently with the sentence for second degree murder and the sentence for use of a firearm to commit a felony to run consecutively to the other two sentences.

Brown appealed his convictions and sentences. We subsequently granted his petition to bypass the Nebraska Court of Appeals.

## ASSIGNMENTS OF ERROR

Brown assigns, restated, that the district court erred (1) by denying his motion to suppress, because the CSLI was obtained in violation of his Fourth Amendment rights; (2) by denying his motion to suppress, because the CSLI was obtained in violation of the Stored Communications Act; (3) by allowing Stamps to testify about being shot in January 2017; and (4) by imposing excessive sentences.

## STANDARD OF REVIEW

[1] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

[2] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Lindsay Internat. Sales & Serv. v. Wegener*, 301 Neb. 1, 917 N.W.2d 133 (2018).

[3] An appellate court will not disturb a sentence imposed within statutory limits absent an abuse of discretion by the trial court. *State v. Steele*, 300 Neb. 617, 915 N.W.2d 560 (2018).

## ANALYSIS

*Fourth Amendment.*

Brown contends that by obtaining CSLI from his cell phone without a warrant supported by probable cause, law enforcement violated his Fourth Amendment rights. Brown argues the

district court thus erred by denying his motion to suppress. For the reasons set forth below, we disagree.

CSLI is generated by cell phone providers. Individual cell phones function by communicating with "cell sites," radio antennas that are mounted on towers and other structures. See *Carpenter v. U.S.*, ___ U.S. ___, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018). When a cell phone connects to a cell site, a time-stamped record is produced. This record is known as CSLI. See *id.* Because the cell phone will connect to the cell site with the best signal, CSLI can be used to determine the location of the cell phone when the connection was made. See *id.* Cell phone providers collect and store CSLI for their own purposes, but because it can be used to determine where a cell phone was at a particular time, it can be useful to law enforcement as well. See *id.*

In this case, law enforcement relied on the federal statute known as the Stored Communications Act, see 18 U.S.C. §§ 2701 to 2711 (2012 & Supp. V 2017), to request and obtain CSLI relating to the cell phone believed to be used by Brown. Under the Stored Communications Act, the government may obtain a court order that requires a cell phone provider to disclose a customer's records if it can demonstrate "specific and articulable facts showing that there are reasonable grounds to believe [the information sought is] relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Section 2703(d) does not require the government to show probable cause. *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016).

On May 31, 2016, a city of Omaha police officer submitted to the district court an application requesting an order compelling disclosure of CSLI pertaining to the cell phone believed to be used by Brown. The district court issued an order that same day finding that in the language of § 2703(d), the applicant "has offered specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material

to an ongoing criminal investigation." The order compelled the cellular service provider to turn over the CSLI to the city of Omaha Police Department. Brown later moved to suppress the CSLI, contending that it was obtained in violation of his Fourth Amendment rights.

The district court denied Brown's suppression motion, finding that the result was controlled by *Jenkins, supra. Jenkins*, which was released a few months after law enforcement obtained the CSLI in this case, held that individuals do not have a reasonable expectation of privacy in CSLI and that thus, the acquisition of CSLI does not implicate, let alone violate, the Fourth Amendment.

[4] While this case was on appeal, however, the U.S. Supreme Court concluded in *Carpenter v. U.S.*, ___ U.S. ___, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), that individuals *do* have a reasonable expectation of privacy in the record of physical movements captured by CSLI. Based on this conclusion, the Court held that "the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Id.*, 138 S. Ct. at 2221.

As the State is forced to concede, our decision in *Jenkins* was effectively overruled by *Carpenter*. And, without the benefit of *Jenkins*, the State also concedes that the acquisition of CSLI without a warrant supported by probable cause violated Brown's Fourth Amendment rights.

The fact that Brown's Fourth Amendment rights were violated, however, does not necessarily mean that it was error for the district court to deny Brown's motion to suppress. See *Herring v. United States*, 555 U.S. 135, 141, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (explaining that application of the exclusionary rule is not "a necessary consequence of a Fourth Amendment violation"). Indeed, the U.S. Supreme Court has observed that the exclusionary rule is to be a "last resort" and not a "first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006). We thus proceed to the question of whether the exclusionary rule applies here.

[5] The exclusion of evidence obtained in violation of the Fourth Amendment is "'not a personal constitutional right.'" *Davis v. United States*, 564 U.S. 229, 236, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011), quoting *Stone v. Powell*, 428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). Rather, the exclusionary rule operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect. *State v. Hoerle*, 297 Neb. 840, 901 N.W.2d 327 (2017). With this purpose in mind, the U.S. Supreme Court has recognized a number of circumstances in which application of the exclusionary rule would not sufficiently deter Fourth Amendment violations and thus the rule does not apply. See, e.g., *Davis, supra* (exclusionary rule does not apply when officers conduct search in objectively reasonable reliance on binding appellate precedent); *Herring, supra* (exclusionary rule does not apply where officers reasonably relied on incorrect information in warrant database); *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (exclusionary rule does not apply when police conduct search in objectively reasonable reliance on warrant later held invalid).

[6] One circumstance recognized to not trigger the exclusionary rule is of particular relevance to this case. In *Illinois v. Krull*, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987), the U.S. Supreme Court held that the exclusionary rule did not apply to evidence obtained by police in objectively reasonable reliance on a statute later found to be unconstitutional. As the Court explained, unless a statute is "clearly unconstitutional," application of the exclusionary rule when the officer acts in reliance on a statute would not serve the purpose of deterring Fourth Amendment violations "[i]f the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter further Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." 480 U.S. at 349, 350.

We have previously followed *Krull*, declining to apply the exclusionary rule when officers obtained evidence in reasonable reliance on a statute later declared unconstitutional. See *Hoerle, supra*.

The rationale for not applying the exclusionary rule in *Krull* applies with full force here. As summarized above, law enforcement obtained the CSLI without first securing a warrant supported by probable cause, but did so as authorized by the Stored Communications Act. It cannot be said that by doing so, law enforcement relied on a statute that was clearly unconstitutional. At the time officers obtained the CSLI in this case, many courts had held, as we did in *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016), that CSLI did not implicate Fourth Amendment protection. See, e.g., *U.S. v. Graham*, 824 F.3d 421 (4th Cir. 2016) (en banc); *U.S. v. Davis*, 785 F.3d 498 (11th Cir. 2015) (en banc); *In re U.S. for Historical Cell Site Data*, 724 F.3d 600 (5th Cir. 2013). And, in *Carpenter v. U.S.*, ___ U.S. ___, 138 S. Ct. 2206, 2214, 201 L. Ed. 2d 507 (2018), while the U.S. Supreme Court ultimately reached a contrary conclusion, it acknowledged that the question did "not fit neatly under existing precedents."

By obtaining the CSLI in this case under the Stored Communications Act and without the benefit of the U.S. Supreme Court's not-yet-issued decision in *Carpenter*, officers were merely following the statute as written. That is not the type of police activity the exclusionary rule seeks to deter. See *Davis v. United States*, 564 U.S. 229, 241, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011), quoting *Leon, supra* ("the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity'").

We are hardly the first court to conclude that CSLI obtained under the Stored Communications Act prior to *Carpenter* is not subject to exclusion. Many other courts have found the same, and Brown has not directed us to any that concluded otherwise. See, e.g., *U.S. v. Curtis*, 901 F.3d 846 (7th Cir. 2018); *U.S. v. Joyner*, 899 F.3d 1199 (11th Cir. 2018); *U.S. v. Chavez*, 894

F.3d 593 (4th Cir. 2018); *U.S. v. Chambers*, No. 16-163-cr, 2018 WL 4523607 (2d Cir. Sept. 21, 2018).

Finally, we note that Brown's only argument against the application of the exclusionary rule is misplaced. Brown contends that the State should not be able to argue for the first time on appeal that an exception to the exclusionary rule applies. Brown argues that he may have been able to introduce factual evidence that would indicate law enforcement officers did not act reasonably in this case and that thus, the exclusionary rule should apply. Brown claims he did not place such evidence into the record at the district court because the State did not assert there that the exclusionary rule should not apply even if Brown's Fourth Amendment rights were violated. But, in fact, the State did make such an assertion in the district court. The State primarily argued that there was no Fourth Amendment violation, but counsel for the State also argued at a hearing on Brown's motion to suppress that even if the Fourth Amendment were violated, the exclusionary rule should not apply, because the officers acted in good faith. While it is not clear to us what evidence Brown could have offered to negate the applicability of *Illinois v. Krull*, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987), under these circumstances, Brown cannot point us to any such evidence, nor can he claim that he lacked the opportunity to present it to the district court.

For these reasons, we find that even though the acquisition of CSLI violated Brown's Fourth Amendment rights, the district court did not err by denying Brown's motion to suppress.

*Stored Communications Act.*

In addition to his Fourth Amendment argument, Brown contends that the CSLI should have been suppressed for another reason. Brown contends that the affidavit submitted in support of the court order failed to establish reasonable grounds to believe that the CSLI was relevant and material to an ongoing criminal investigation, as required by the Stored

Communications Act. Once again, we find that Brown's argument lacks merit.

We need not analyze the affidavit or the showing required under the Stored Communications Act in order to dispose of Brown's argument. This is so because even assuming the affidavit failed to make the required showing under the Stored Communications Act, it does not follow that the CSLI should have been suppressed.

The Stored Communications Act provides a number of specific remedies for violations thereof, but suppression of evidence in a criminal case is not one of them. See 18 U.S.C. § 2707(b) and (d). Additionally, the act provides that the listed remedies are exclusive. 18 U.S.C. § 2708. On this basis, many courts have found that suppression is not an available remedy even if evidence is obtained in violation of the act. See, e.g., *U.S. v. Gasperini*, 894 F.3d 482 (2d Cir. 2018); *U.S. v. Guerrero*, 768 F.3d 351 (5th Cir. 2014); *U.S. v. Clenney*, 631 F.3d 658 (4th Cir. 2011); *U.S. v. Perrine*, 518 F.3d 1196 (10th Cir. 2008); *U.S. v. Madison*, 643 Fed. Appx. 886 (11th Cir. 2016).

We agree that suppression is not an available remedy for a violation of the Stored Communications Act, and we thus find no merit to Brown's argument that the evidence should have been suppressed.

*Stamps' Testimony.*

Brown next argues the district court erred by allowing Stamps to testify that months before trial, he and his girlfriend were shot, and that as a result, he suffered serious injury and his girlfriend died. Brown argues that this evidence was irrelevant and that even if it were relevant, it should have been excluded under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), because its probative value was outweighed by the danger of unfair prejudice. Brown argues the district court committed reversible error by allowing the testimony. We disagree.

[7-9] Evidence that is irrelevant is inadmissible. Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2016); *Lindsay Internat. Sales & Serv. v. Wegener*, 301 Neb. 1, 917 N.W.2d 133 (2018). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016). The bar for establishing relevance is not a high one. Relevancy requires only that the probative value be "'something more than nothing.'" *Lindsay Internat. Sales & Serv.*, 301 Neb. at 16, 917 N.W.2d at 144. We will not reverse a trial court's determination regarding the relevancy of evidence unless it constitutes an abuse of discretion. See *id.*

Some background regarding Stamps' cooperation in this case is pertinent to the analysis. Stamps' cooperation with law enforcement in the investigation of Brown was inconsistent. It began in July 2016 while Stamps was under arrest and being questioned for an unrelated homicide. At that time, Stamps offered to provide information regarding the death of Alonzo in exchange for a bond reduction. According to Stamps, he provided some information implicating Brown in Alonzo's death, but not all the information he could have provided. Stamps received a bond reduction and was released from jail.

Stamps later came to regret this act of cooperation. Stamps attended Brown's preliminary hearing with several of Brown's other friends. At the hearing, the officer to whom Stamps had provided information implicating Brown identified Stamps as a source of information regarding Brown's involvement. Stamps responded by executing an affidavit denying the statements the officer had attributed to him and threatened to sue the officer for defamation. Stamps testified that he signed the affidavit in an attempt to be "loyal" to Brown.

Stamps would reverse course again, however. He testified that on January 26, 2017, he and his girlfriend were shot as they sat in a car, and that as a result, he was injured and his

girlfriend died. Stamps testified that after he was released from the hospital, he came to law enforcement and indicated a desire to "cooperate on everything that I knew, clear my conscience."

The State argued in the district court and now argues on appeal that the fact that Stamps was shot is relevant because it explains why he testified against Brown after initially claiming that an officer defamed him by claiming he offered information against Brown. According to the State, Stamps' experience as a victim of gun violence prompted a desire to "clear [his] conscience" and thus was relevant to his credibility. Although Stamps does not appear to have explicitly testified that his ultimate decision to testify against Brown was influenced by being shot, that can be fairly implied from his testimony.

We believe the district court did not abuse its discretion by finding such testimony to be relevant. Stamps wavered between providing partial information to law enforcement regarding Brown's involvement in Alonzo's death, to denying having provided any information at all, to providing a fuller account of Brown's involvement. The fact that he was shot provided an explanation for his ultimate decision to testify, and thus the district court did not abuse its discretion by finding it to be relevant to his credibility.

[10-12] We also conclude that the district court did not abuse its discretion by finding that the testimony was not subject to exclusion under rule 403. Under rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018). Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. *Id.* It speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis. *Id.*

Brown argues that even if the fact that Stamps and his girlfriend were shot were relevant to his credibility, any relevance

was outweighed by the danger of unfair prejudice. Brown argues that upon hearing the testimony that Stamps and his girlfriend were shot, the jury would assume that Brown or his associates were responsible. The district court, however, specifically instructed the jury that there was no evidence Brown was involved in the shooting and that the evidence was not being offered for this purpose. The district court's instruction was as follows:

[Y]ou're going to hear some testimony on a line of questioning that relates to an event in . . . Stamps' life. It's being offered for the limited [purpose] of showing the effect that that event had on . . . Stamps. There is no evidence of and there is no suggestion by the State that the event you're going to hear described had anything at all to do with the defendant, . . . Brown, in any manner or in any fashion. This is evidence that you are to hear solely for the limited purpose . . . of the effect of this event on the witness, . . . Stamps.

In its final jury instructions, the district court again instructed the jury regarding evidence received for a limited purpose, stating, "During the trial, I called your attention to some evidence that was received for a specific limited purpose. You must consider that . . . evidence only for those limited purposes and for no other reason."

We have recently held that while a limiting instruction or an instruction to disregard does not automatically eliminate any risk of unfair prejudice, such an instruction can sufficiently mitigate the risk of unfair prejudice in a particular case. See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). In *Rocha*, we held that the district court did not abuse its discretion in admitting opinion statements made by a law enforcement officer in a recorded interview of the defendant. We noted that the officer's statements had minimal probative value and that they "carr[ied] a special risk of unfair prejudice." *Id.* at 744, 890 N.W.2d at 201. Even so, we held that the district court did not abuse its discretion by admitting the statements.

We pointed to instructions from the trial court, in which it informed the jury that it should not consider the officer's statements as substantive evidence and that they should not be given weight in determining the truthfulness of the defendant's statements in response. We held these instructions mitigated the risk of unfair prejudice. *Id.*

For similar reasons, we reach the same conclusion here. The district court did not allow the State to introduce evidence suggesting Brown had anything to do with the shooting of Stamps and his girlfriend. And to the extent any juror was inclined to speculate about Brown's involvement, the district court's instruction informed jurors that there was "no evidence" and "no suggestion" Brown had anything to do with the shooting and that jurors were to consider Stamps' testimony only for the effect the incident had on him. We believe these instructions mitigated the risk of unfair prejudice and thus cannot say the district court abused its discretion by admitting the testimony.

*Excessive Sentences.*

Lastly, we address Brown's claim that he received excessive sentences. He does not dispute that the sentences imposed were within statutory limits for his respective offenses. Rather, he argues that the district court did not adequately account for his difficult upbringing in fashioning his sentences.

[13-16] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018). Relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense

and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. And generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

Having reviewed the record, we cannot say that the district court abused its discretion in sentencing Brown. The district court stated that in sentencing Brown, it had considered, among other things, a presentence investigation report and a sentencing memorandum provided by Brown's counsel. Both the report and the sentencing memorandum provided background on Brown's difficult upbringing. We thus have no reason to believe that the district court failed to consider Brown's upbringing along with other factors in its sentencing calculus. Those other factors, however, would include the fact that Brown had been previously convicted of three felonies and was found responsible for a shooting that left a man dead. In light of the relevant sentencing factors, we conclude that the district court did not abuse its discretion in sentencing Brown.

## CONCLUSION

We conclude that the district court did not err in denying Brown's motion to suppress, in admitting the testimony that Stamps and his girlfriend were shot, or in sentencing Brown. Consequently, we affirm.

AFFIRMED.