Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/10/2019 09:06 AM CDT

State of Nebraska, appellee, v.
Lucio P. Munoz, appellant.
___ N.W.2d ___

Filed May 10, 2019.    No. S-18-050.

1.  **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.
2.  **Effectiveness of Counsel: Appeal and Error.** Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance.
3.  **Appeal and Error.** An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.
4.  **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.
5.  **Appeal and Error.** In the absence of plain error, where an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.
6.  **Trial: Prosecuting Attorneys.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.
7.  ____: ____. A prosecutor is entitled to draw inferences from the evidence in presenting his or her case, and such inferences generally do not amount to prosecutorial misconduct.

8. ____: ____. A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

9. **Rules of Evidence: Intent.** The purpose of Neb. Rev. Stat. § 27-513(2) (Reissue 2016) is to prevent the jury from drawing an unfavorable inference from a witness' assertion of a privilege.

10. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

11. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

12. ____: ____: ____. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

13. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

14. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

15. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

16. **Trial: Effectiveness of Counsel: Prosecuting Attorneys: Appeal and Error.** Determining whether defense counsel was ineffective in failing to object to prosecutorial misconduct requires an appellate court to first determine whether the petitioner has alleged any action or remarks that constituted prosecutorial misconduct.

17. **Evidence.** Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

18. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.
19. **Criminal Law: Evidence.** The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.

Appeal from the District Court for Scotts Bluff County: Leo P. Dobrovolny, Judge. Affirmed.

Kelly S. Breen, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

In this direct appeal from criminal convictions, Lucio P. Munoz focuses on three incidents at trial: (1) a comment during the prosecutor's opening statement about evidence not found, (2) a witness' assertion of a testimonial privilege in the jury's presence, and (3) expert testimony regarding blood spatter evidence. Because trial counsel did not object, Munoz alleges plain error and ineffective assistance of counsel. We find neither. The prosecutor's statement was consistent with the evidence. The bill of exceptions does not show that the prosecutor knew the witness would assert a privilege. And the blood spatter evidence was neither irrelevant nor unfairly prejudicial. We affirm the district court's judgment.

## II. BACKGROUND

On Friday, December 30, 2016, at approximately 10 p.m., Munoz knocked on Trudy Ziegler's door. He told her that his girlfriend, Melissa May, had been raped that morning by a tenant of the same apartment complex where they all lived.

Ziegler told Munoz to call the police, and he did so from her apartment.

Just after 11 p.m., two police officers arrived at the apartment complex. Their body cameras recorded the interaction. Munoz told the officers that May had been raped. He allowed the officers into his apartment, where an intoxicated May was asleep on Munoz' bed. After Munoz woke her, May told the officers that she did not know why they had been called and Munoz told her to "tell them the truth." May did not wish to make a police report. One of the officers told Munoz that when May was sober, she could come talk to the police. Munoz replied that she was not going to do so. He added, "But something's gonna happen, I know."

An upset Munoz returned to Ziegler's apartment and said that May did not want to press charges. He asked "what do I do now," and Ziegler told him "just love her all the more."

At approximately 2 a.m. on December 31, 2016, Munoz called his son, Martin Brady. Munoz told Brady that he "did something . . . bad" and that he wanted to kill himself. Brady's girlfriend called the police to check on Munoz.

The same two officers returned to Munoz' apartment shortly after 3 a.m. Again, their body cameras recorded the interaction. Munoz said that he was feeling bad "because of what happened." He allowed the officers into his apartment. The door to his bedroom was closed, and he told the officers that his girlfriend had gone home. Munoz agreed to go to a hospital to speak with someone. He locked the deadbolt on his apartment door, and one of the officers drove him to the hospital.

At approximately 8 a.m., Brady received a call from a doctor for Munoz "to get out of the . . . hospital." Brady and his girlfriend picked up Munoz and took him to Brady's house. Munoz stayed at Brady's house the rest of the morning, and at some point, arrangements were made for Munoz to leave town. Brady explained that Munoz had talked about seeing family because it had "been awhile" and that Munoz had brothers in Texas and Illinois.

A friend of Munoz agreed to take Munoz to Illinois to visit one of his brothers. The friend asked if Munoz wanted to travel the next day, but Munoz said he wanted a ride as soon as possible. So, the friend testified, they "gassed up, and headed out." According to the friend, Munoz had no luggage or other items and he left Munoz in Illinois with Munoz' brother.

Meanwhile, Ziegler did not see Munoz or May on Saturday, which she said was unusual. On Sunday and Monday, Ziegler knocked on Munoz' door, but there was no answer. On Tuesday, January 3, 2017, Ziegler asked the property manager to check on May. Using a master key to unlock the deadbolt, the property manager entered Munoz' apartment. She opened the bedroom door and discovered May, deceased, on the bed.

An autopsy revealed that May had suffered 37 stab wounds, and the cause of death was determined to be multiple stab wounds. The turquoise sweatshirt on May's body appeared to match her top as depicted on the December 30, 2016, body camera footage. Evidence for a sexual assault kit was collected, and it showed no DNA profile other than that of May.

Munoz' brother in Texas began searching for Munoz due to a concern that "something had happened . . . where he live[s]." After making telephone calls, he discovered that Munoz was in Illinois. Munoz asked his brother to forgive him, but did not say for what. During later conversations, Munoz "said that he was going to die in prison."

Officers with the Scotts Bluff County sheriff's office flew to Illinois to transport Munoz back to Scotts Bluff County. As they were going through the airport to catch a connecting flight, they heard someone playing a piano and Munoz said "they are playing my death song" and "I'm going to get the death penalty." While waiting for a flight, Munoz asked the other officer questions about Nebraska's death penalty, including "if it was voted back in" and the method of execution.

The State charged Munoz with first degree murder and use of a deadly weapon to commit a felony, and the court

conducted a jury trial. Additional background concerning events occurring during trial will be set forth in the analysis section.

The jury returned verdicts of guilty on both counts. The court imposed a sentence of life imprisonment for the murder conviction and of 20 to 40 years' imprisonment for the use of a weapon conviction. This timely appeal followed.

## III. ASSIGNMENTS OF ERROR

Munoz' five assignments of error fall into two general categories. He asserts as plain error that prosecutorial misconduct occurred during opening statements and that the court erred by permitting Brady to invoke his Fifth Amendment privilege in the presence of the jury.

Munoz assigns that his trial counsel provided ineffective assistance by failing to object to the prosecutor's opening statement, failing to demand compliance with Neb. Evid. R. 513(2), Neb. Rev. Stat. § 27-513(2) (Reissue 2016), and failing to challenge blood spatter evidence.

[1,2] The argument section of Munoz' brief contains a subsection concerning additional instances of alleged ineffective assistance of counsel, but these issues were not assigned as error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[1] Moreover, assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance.[2] We do not consider these additional unassigned matters.

## IV. STANDARD OF REVIEW

[3] An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly

---

[1] *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019).

[2] See *State v. Mrza*, 302 Neb. 931, ___ N.W.2d ___ (2019).

evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[3]

[4] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[4]

## V. ANALYSIS

### 1. PLAIN ERROR

[5] Munoz presents two issues as a matter of plain error, because he did not object or otherwise preserve the issue for appellate review. In the absence of plain error, where an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.[5]

### (a) Prosecutorial Misconduct

Munoz contends that the following remarks by the prosecutor during his opening statement amounted to prosecutorial misconduct:

> There is some DNA evidence in this case and I think I told some of you that the last trial we had. The murder weapon was not found. His clothing with . . . May's blood was not found. Of course, we have about [a] four hour time gap from the time the police were first there and the time — the second they were there. And, the clothes he

---

[3] *Id.*

[4] *Id.*

[5] *State v. Trice*, 292 Neb. 482, 874 N.W.2d 286 (2016).

has when he is arrested in Illinois and are sent back here
are not the clothes he left with. Those were changed.

Munoz claims the above statements are problematic, because
there was no evidence that Munoz hid or destroyed "blood"
evidence or that May's blood was found on any article of
clothing belonging to Munoz.

We begin with the observation that the jury was informed
that opening statements are not evidence. The prosecutor told
the jury, "This is opening statement, what we say right now is
not evidence." And although the court's preliminary instruc-
tions were not memorialized in the record, Munoz' coun-
sel stated:

As [the judge] indicated in the preliminary instruction
that he gave to you, we talked about opening statements.
He indicated that the statements that the attorneys get to
make at this time should not be considered as evidence.
So anything that [the prosecutor] told you just a few min-
utes ago should not be considered as evidence and don't
consider anything that I'm going to tell you is evidence
as well.

[6-8] When considering a claim of prosecutorial miscon-
duct, an appellate court first considers whether the pros-
ecutor's acts constitute misconduct.[6] A prosecutor is enti-
tled to draw inferences from the evidence in presenting his
or her case, and such inferences generally do not amount
to prosecutorial misconduct.[7] And a prosecutor's conduct
that does not mislead and unduly influence the jury is not
misconduct.[8]

The prosecutor's opening statement did not constitute pros-
ecutorial misconduct. The evidence at trial was consistent
with the prosecutor's opening statement: Neither the murder

---

[6] *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

[7] *State v. Taylor*, 300 Neb. 629, 915 N.W.2d 568 (2018).

[8] *State v. Swindle, supra* note 6.

weapon nor any of Munoz' clothing containing May's blood was found, and Munoz was wearing different clothing at the time of his arrest than the clothing he was wearing when he left town. Because there was no prosecutorial misconduct, it follows that there can be no plain error.

### (b) Assertion of Privilege

Munoz also claims that plain error occurred when Brady invoked his Fifth Amendment privilege in the jury's presence. After Brady identified Munoz in the courtroom, the following colloquy occurred:

> [Prosecutor:] Okay. Do you then recall having a conversation with him in the early [sic] December 31st of 2016?
>
> [Brady:] I would like to invoke my Fifth Amendment rights.
>
> [Prosecutor]: Okay. Judge, I'm going to go ahead and offer immunity.
>
> THE COURT: All right. Sir, the County Attorney has heard your exercise of your Fifth Amendment rights under the United States Constitution. Under Nebraska law if the County Attorney indicates that immunity will be granted you for anything you may say here in the courtroom, you are required to testify. So notwithstanding your exercise of your Fifth Amendment rights, because the County Attorney has extended you immunity, I'm ordering you to go ahead and answer his questions.
>
> [Brady]: Okay.

Brady then proceeded to answer all questions posed to him.

[9] Munoz argues that plain error occurred when Brady was permitted to invoke his Fifth Amendment privilege in the presence of the jury. He relies on § 27-513(2), which states that "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." We have explained

that the purpose of § 27-513(2) is to prevent the jury from drawing an unfavorable inference from a witness' assertion of a privilege.[9]

We recently addressed the invocation of a privilege in the jury's presence, but the circumstances here are distinguishable. In *State v. Draper*,[10] the trial court permitted the defendant's wife to assert her privilege against self-incrimination in the presence of the jury. We stated: "[A]ll parties knew that she would, before being granted immunity, invoke her privilege against self-incrimination. And the record fails to establish any basis justifying the assertion of that privilege in front of the jury."[11] In contrast, the bill of exceptions here does not indicate that any party or the court knew in advance that Brady would invoke his Fifth Amendment privilege against self-incrimination.

Under the circumstances here, error is not plainly evident from the record. Munoz argues: "Clearly the prosecutor anticipated that Brady would invoke his 5th Amendment right not to testify during his direct examination. Otherwise he would not have been prepared to immediately offer the witness immunity."[12] But it is just as conceivable that the criminal investigation had revealed Brady's involvement was minimal and not worthy of prosecution, such that the prosecutor had no hesitation about offering immunity.[13] The bill of exceptions does not contain evidence showing that the parties or the court knew Brady would invoke his privilege. And, after being given immunity, Brady testified and was subject to cross-examination. We find no plain error.

---

[9] See *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015).

[10] *Id.*

[11] *Id.* at 789, 857 N.W.2d at 344.

[12] Brief for appellant at 13.

[13] See Neb. Rev. Stat. § 29-2011.02 (Reissue 2016).

## 2. Ineffective Assistance
### of Counsel

Munoz' other assignments of error allege that his trial counsel provided ineffective assistance. After setting forth general principles, we consider the specific allegations of ineffective assistance.

### (a) General Principles

[10-12] Munoz has different counsel on direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[14] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.[15] The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[16]

[13-15] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[17] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the

---

[14] *State v. Mrza, supra* note 2.

[15] *Id.*

[16] See *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018).

[17] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

defendant's defense.[18] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[19] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.[20]

### (b) Opening Statement

[16] Munoz argues that his trial counsel was ineffective in failing to object to the prosecutor's opening statement. Determining whether defense counsel was ineffective in failing to object to prosecutorial misconduct requires an appellate court to first determine whether the petitioner has alleged any action or remarks that constituted prosecutorial misconduct.[21] As we determined above, the prosecutor's opening statement did not amount to prosecutorial misconduct. Because there was no basis to object, Munoz' counsel did not perform deficiently in failing to object.

### (c) Failing to Demand Compliance
### With § 27-513

Munoz next contends that counsel was ineffective for failing to demand compliance with § 27-513. As noted above, the bill of exceptions does not reveal that any party knew Brady would assert his Fifth Amendment privilege, and Munoz does not cite to any evidence that such knowledge existed.

Even if it were known that Brady would invoke the Fifth Amendment, Munoz cannot show prejudice due to counsel's

---

[18] *State v. Mrza, supra* note 2.

[19] *Id.*

[20] *Id.*

[21] *State v. Taylor, supra* note 7.

failure to object and demand compliance with § 27-513. There is no indication that by calling Brady as a witness, the prosecutor was trying to build a case out of inferences from use of a testimonial privilege. Further, we are not presented with the situation where "'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination.'"[22] Because Brady testified and was subject to cross-examination, Munoz cannot demonstrate a reasonable probability that the result of the proceeding would have been different if Brady had invoked the privilege outside of the jury's presence.

### (d) Blood Spatter Evidence

Finally, Munoz argues that his trial counsel was ineffective by failing to challenge blood spatter evidence as irrelevant and unfairly prejudicial. We disagree.

The State's blood spatter expert visited the scene and documented bloodstain patterns. Based on the blood evidence, the expert gave "brief snapshots of what happened at different times":

> So there were some impact patterns and castoff near the head of the bed and it's my opinion that the victim was laying there wrapped up in a blanket on top of the blankets underneath her, basically, the black plaid blankets and the blankets underneath when this attack started. There were enough spatter patterns to indicate that some liquid blood had been shed while she was in that position, and that something impacted into it. I wasn't able to determine what. Sometime during the attack she had turned around toward with her head toward the foot of the bed, her feet toward the head of the bed. And, after she was stabbed she had somehow was laying, as I mentioned before, laying head first on top of the white

---

[22] *State v. Draper, supra* note 9, 289 Neb. at 786, 857 N.W.2d at 342.

comforter, her left arm down creating that pooling off of the side of the bed. Based on the position of her right arm and based on the lack of blood around her right arm, . . . it's my opinion that somebody took her right arm and pulled her back up onto the bed. I don't know if she was alive at that time, it's possible. If she was in that final position when the spatter around her was created, which led me to believe it's probably expectorate, but could, also, be spatter patterns from something impacting the liquid blood on her. When she was in this final position somebody covered her up within five to 30 minutes after her blood was deposited based on the (inaudible) on her hip. Somebody with blood on them, and I can't say how much, but some liquid blood on them moved around to the foot of that bed creating those transfer patterns. And, after it was all done, whoever it was, walked into the bathroom, probably washed off their hands, washed off the weapon, creating the diluted blood around the rim of the sink.

Munoz first argues that the evidence was irrelevant. Evidence which is not relevant is inadmissible.[23] Munoz highlights that the blood spatter expert did not identify any evidentiary link between the blood evidence and any particular suspect nor any particular object associated with a suspect.

[17] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[24] Relevancy requires only that the probative value be something more than nothing.[25]

The blood spatter evidence satisfied the low bar for establishing relevancy. It showed the brutal nature of May's death,

---

[23] Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2016).

[24] Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016).

[25] *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019).

which was consistent with the State's theory that Munoz believed May was "cheating on" him and "react[ed] violently." This alone satisfies the minimal requirement that the probative value of the evidence be something more than nothing. Because a relevancy objection would have been futile, counsel did not perform deficiently by failing to object on relevancy grounds.

Munoz also claims that the blood spatter evidence was unfairly prejudicial. He points out that the blood spatter expert provided testimony regarding photographs that she used in her report. Munoz claims that the direct examination of the expert "was merely an opportunity for the State to overly emphasize the horrific and brutal nature of an unidentified assailant's attack."[26]

[18] Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.[27] It speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.[28]

[19] Gruesome crimes produce gruesome photographs and evidence.[29] But the State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[30] Using the blood evidence found at the crime scene, the blood spatter expert helped explain what happened during the attack on May. Although

---

[26] Brief for appellant at 15.

[27] *State v. Brown, supra* note 25.

[28] *Id.*

[29] See *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016).

[30] *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

the expert could not identify May's killer, we do not believe that the district court would have excluded the evidence on the basis that the probative value of the expert's testimony was substantially outweighed by the danger of unfair prejudice. Accordingly, Munoz' trial counsel did not perform deficiently by failing to object.

## VI. CONCLUSION

We find no plain error with regard to the prosecutor's opening statement or the invocation of Fifth Amendment privilege in the jury's presence. With regard to Munoz' claims of ineffective assistance of trial counsel, we conclude that the record on appeal shows the claims to be without merit. We therefore affirm the judgment of the district court.

Affirmed.